NO. 07-07-0310-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



SEPTEMBER 25, 2008



______________________________





CHRISTOPHER LEE SIMPSON JR., APPELLANT



v.



THE STATE OF TEXAS, APPELLEE





_________________________________



FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY;



NO. 06-4934-1; HON. SUZANNE BROOKS, PRESIDING



_______________________________



Before CAMPBELL and HANCOCK and PIRTLE, JJ.
Memorandum Opinion
Â Â Â Â Â Â Â Â Â Â Appellant, Christopher Lee Simpson, Jr., appeals his conviction for the offense of
driving while intoxicated and sentence of incarceration for 365 days in the Williamson
County Jail. We affirm.
Background
Â Â Â Â Â Â Â Â Â Â On June 13, 2006, at around 4:15 a.m., appellant was seen driving his truck on a
public road in Williamson County by Officer Anthony Catalano. Catalano was sitting in his
patrol car monitoring traffic when he saw appellant drive past at what Catalano believed
to be a speed well over the posted speed limit of 60 miles per hour. Catalano then used
the radar device in his patrol car to confirm that appellant was speeding. According to the
radar, appellant was traveling at a speed of 74 miles per hour. On the basis of this
information, Catalano initiated a traffic stop of appellant. Upon approaching appellant,
Catalano smelled the odor of alcohol coming from inside the vehicle and observed that
appellantâs eyes were red and had a âglossyâ appearance. As a result, Catalano asked
appellant to step out of the vehicle. Catalano performed field sobriety tests (hereafter,
âFSTâ) on appellant. On all three tests, Catalano observed clues of intoxication. Catalano
then placed appellant under arrest for driving while intoxicated. Once he was transported
to the station, appellant refused to provide a breath sample for testing.
Â Â Â Â Â Â Â Â Â Â Appellant was charged with the offense of driving while intoxicated. The information
further alleged that appellant had been previously convicted of a driving while intoxicated
offense. Prior to trial, appellant filed two motions to suppress evidence. These motions
challenged Catalonaâs reasonable suspicion to stop appellant, Catalonaâs probable cause
to arrest appellant, and the admissibility of any statements made by appellant during the
investigatory detention or while under arrest. Prior to the beginning of the trial, the trial
court heard appellantâs motions. All of the testimony elicited during this hearing related to
Catalonaâs reasonable suspicion for the stop. Prior to ruling on the motions, the trial court
specifically asked appellant if he was limiting his motion to suppress to the issue of the
reasonable suspicion for the stop and appellant confirmed that this was the only issue he
was challenging by way of the motions. The trial court then overruled appellantâs motions
and the case proceeded to trial.
Â Â Â Â Â Â Â Â Â Â During the trial, Catalona testified as to the basis for his stop of appellant as well as
his administration of the FST. Appellant objected to Catalonaâs testimony regarding the
FST based on appellantâs allegation that Catalona failed to follow the standards required
in administering the FST. The trial court overruled appellantâs objection. By cross-examination, appellant questioned Catalona about the basis for his stop of appellant and
the method of his administration of the FST. At the close of evidence, appellant requested
that the jury charge include a specific paragraph discussing the burden of proof required
to convict appellant. After hearing argument on this issue, the trial court denied the
requested instruction. The jury returned a verdict finding appellant guilty and the trial court
assessed his punishment at 365 days incarceration in the Williamson County Jail.
Â Â Â Â Â Â Â Â Â Â By three issues, appellant challenges the judgment and sentence. Appellantâs first
issue contends that the trial court erred in denying appellantâs motion to suppress evidence
based on the illegality of Catalonaâs stop of appellant. Appellantâs second issue challenges
the trial courtâs denial of appellantâs motion to suppress evidence based on Catalonaâs
failure to properly administer the FST.


 By his final issue, appellant contends that the trial
court erred in denying appellantâs request that an additional instruction be included in the
jury charge.
Motion to Suppress
Â Â Â Â Â Â Â Â Â Â By his first issue, appellant contends that the trial court erred in denying his motion
to suppress evidence obtained as a result of Catalonaâs stop of appellant because
Catalona lacked reasonable suspicion for the stop. The State responds that Catalona had
the requisite reasonable suspicion based on his visual estimate that appellant was traveling
in excess of the posted speed limit and the confirmation that appellant was speeding
provided by Catalonaâs in-car radar.
Â Â Â Â Â Â Â Â Â Â Generally, a trial courtâs ruling on a motion to suppress is reviewed by an abuse of
discretion standard. See Oles v. State, 993 S.W.2d 103, 106 (Tex.Crim.App. 1999); 
Maddox v. State, 682 S.W.2d 563, 564 (Tex.Crim.App. 1985). Whether the trial court
abused its discretion depends upon whether, given the record and the law, its decision fell
outside the zone of reasonable disagreement. See Benitez v. State, 5 S.W.3d 915, 918
(Tex.App.âAmarillo 1999, pet. refâd). However, if the facts determinative of the motion are
undisputed, then the review is de novo. See Oles, 993 S.W.2d at 106; Guzman v. State,
955 S.W.2d 85, 89 (Tex.Crim.App. 1997). 
Â Â Â Â Â Â Â Â Â Â A police officer may stop and temporarily detain an individual whom he suspects of
criminal activity as long as the officer has a âreasonable suspicion that some activity out
of the ordinary is occurring or has occurred, some suggestion to connect the detainee with 
the unusual activity, and some indication the unusual activity is related to crime.â Garza
v. State, 771 S.W.2d 549, 558 (Tex.Crim.App. 1989) (en banc). A police officer may
lawfully stop and detain a person for a traffic violation so long as the officer has a
reasonable basis for suspecting an offense has been committed. McVickers v. State, 874
S.W.2d 662, 664 (Tex.Crim.App. 1993). Further, a police officer does not need to know
the exact speed at which an automobile is traveling in order to make a stop for a traffic
violation. Dillard v. State, 550 S.W.2d 45, 53 (Tex.Crim.App. 1977) (op. on rehâg). To
justify a temporary detention, an officer must articulate facts which, in light of his
experience and personal knowledge, together with reasonable inferences drawn from
those facts, would warrant a temporary intrusion on the freedom of the person detained. 
Woods v. State, 956 S.W.2d 33, 38 (Tex.Crim.App. 1997).
Â Â Â Â Â Â Â Â Â Â In the present case, Catalona testified, at the hearing on the motion to suppress,
that he visually estimated that appellantâs vehicle was traveling at around 70 miles per
hour, which was 10 miles per hour over the posted speed limit. Catalona then used his in-car radar to confirm his visual estimate. The radar, which Catalona testified that he had
been trained to use and that he had calibrated for accuracy at the beginning of his shift,
indicated that appellantâs vehicle was traveling at 74 miles per hour. Appellant contends
that Catalona did not have reasonable suspicion to stop appellant because Catalona did
not use any standard methodology upon which to base his visual estimate of appellantâs
speed and because the audio portion of his radar was not functioning at the time that
Catalona used it to check appellantâs speed.


 
Â Â Â Â Â Â Â Â Â Â An officerâs visual estimate of a vehicleâs speed may be sufficient to give an officer
a reasonable suspicion to stop the vehicle. See Hesskew v. Tex. Depât of Pub. Safety, 144
S.W.3d 189, 191 (Tex.App.âTyler 2004, no pet.); Icke v. State, 36 S.W.3d 913, 915-16
(Tex.App.âHouston [1st Dist.] 2001, pet. refâd). In addition, an officerâs testimony that he
had been both trained to operate a radar and test for its accuracy is a sufficient predicate
to support admission of radar evidence. Cromer v. State, 374 S.W.2d 884, 887
(Tex.Crim.App. 1964). Thus, we conclude that Catalonaâs visual estimate of appellantâs
speed, confirmed by his in-car radar unit, provided a sufficient basis for Catalona to
reasonably believe that appellant was violating a traffic law. Therefore, we conclude that
Catalona possessed sufficient reasonable suspicion to justify the stop of appellant and the
trial court did not err in denying appellantâs motion to suppress evidence.
Â Â Â Â Â Â Â Â Â Â We overrule appellantâs first issue.
Admission of Evidence of Field Sobriety Tests
Â Â Â Â Â Â Â Â Â Â By his second issue, appellant contends that the trial court erred in overruling his
objection to Catalonaâs testimony regarding the administration of and conclusions drawn
from the FST. Specifically, appellant contends that Catalona did not perform the required
minimum number of passes while administering the horizontal gaze nystagmus test and
administered the walk and turn and one-leg stand tests on an improperly sloped surface
and, thus, the tests are not reliable proof of appellantâs intoxication. The State contends
that slight variations in the administration of the FST does not render the evidence
inadmissible or unreliable, but rather goes to the weight to be afforded that evidence.
Â Â Â Â Â Â Â Â Â Â A trial courtâs decision to admit or exclude evidence is reviewed under an abuse of
discretion standard. See Weatherred v. State, 15 S.W.3d 540, 542 (Tex.Crim.App.2000);
Green v. State, 934 S.W.2d 92, 101-02 (Tex.Crim.App. 1996). A reviewing court should
not reverse a trial judgeâs decision whose ruling was within the zone of reasonable
disagreement. Green, 934 S.W.2d at 102. If the trial judge's decision is correct on any
theory of law applicable to the case, the decision will be sustained. State v. Ross, 32
S.W.3d 853, 855-56 (Tex.Crim.App. 2000). 
Â Â Â Â Â Â Â Â Â Â The battery of FST utilized by Catalona have been found to be reliable indicators
of intoxication, provided that the tests are administered in accordance with the
standardized guidelines. See Emerson v. State, 880 S.W.2d 759, 768-69 (Tex.Crim.App.
1994); Compton v. State, 120 S.W.3d 375, 377 (Tex.App.âTexarkana 2003, pet. refâd). 
However, slight deviations from the guidelines in administering the FST do not render the
evidence inadmissible, but may affect the weight to be afforded the evidence. See
Compton, 120 S.W.3d at 378 (citing Preface to Natâl Highway Traffic Safety Admin., U.S.
Depât of Transp., DWI DETECTION AND STANDARDIZED FIELD SOBRIETY TESTING
STUDENT MANUAL).
Â Â Â Â Â Â Â Â Â Â In the present case, appellant argues that Catalona failed to perform the requisite
number of passes in administering the horizontal gaze nystagmus test, thus, making the
test unreliable as an indicator of intoxication. However, on voir dire examination, Catalona
testified that he performed âmore than the minimumâ number of passes when administering
the test on appellant. In addition, the trial court indicated that it reviewed the videotape of
Catalonaâs performance of the test on appellant before overruling appellantâs objection.


 
As the crux of the dispute over the horizontal gaze nystagmus test relates to the
determination of the historical fact of whether Catalona performed the requisite number of
passes on appellant for the test to be considered reliable, we will afford almost total
deference to the trial courtâs determination. See Loserth v. State, 963 S.W.2d 770, 773
(Tex.Crim.App. 1998). The trial court was free to believe or disbelieve Catalonaâs
testimony that he performed more than the minimum number of passes in administering
the test on appellant and we will not disturb the trial courtâs determination that the
horizontal gaze nystagmus test was administered in compliance with the standardized
requirements for the test absent a showing of an abuse of discretion. See Ross, 32
S.W.3d at 858.
Â Â Â Â Â Â Â Â Â Â As to the walk and turn and one-leg stand tests, appellant contends that the ground
upon which Catalona performed the tests was not level and that this invalidates the test
results. Catalona testified that the surface upon which he administered these tests was
reasonably flat. By way of further explanation, Catalona testified that, âI say it was
reasonably flat because when we are standing out there I could not feel the weight of the
slope. I could not feel my weight if I was standing on a flat surface.â In addition, the trial
court saw evidence of the slope of the ground upon which these tests were performed both
in pictures offered by appellant and in the videotape of the performance of the FST. The
crux of the dispute regarding the administration of these tests is the factual determination
of whether the slope of the surface upon which these tests were administered were such
âslight deviationsâ that the tests remained valid indicators of intoxication. As above, we will
afford almost total deference to the trial courtâs factual determination. Loserth, 963 S.W.2d
at 773. The trial court was free to believe or disbelieve Catalonaâs testimony that the walk
and turn and one-leg stand were performed on a reasonably flat surface and we will not
disturb the trial courtâs implicit determination that the slope was a slight deviation from the
standard and did not invalidate the tests absent a showing of an abuse of discretion. See 
Ross, 32 S.W.3d at 858.
Â Â Â Â Â Â Â Â Â Â Because appellant has failed to establish that the trial court abused its discretion in
overruling appellantâs objection to the evidence of the FST, we overrule appellantâs second
issue.
Jury Instruction
Â Â Â Â Â Â Â Â Â Â By his third issue, appellant contends that the trial court erred in denying his request
that an additional jury instruction be included in the jury charge. Appellant requested that
the trial court include the following language in the charge:
You are further instructed that you cannot convict the defendant in this case
unless you believe from the evidence beyond a reasonable doubt that the
defendant did operate a motor vehicle in a public place within the County of
Williamson and State of Texas as alleged in the indictment or as alleged in
the information and unless you further believe the evidence beyond a
reasonable doubt that the defendant was intoxicated at the very time he is
alleged to have operated said motor vehicle. And if you have reasonable
doubt as to either of these two matters, you must resolve that doubt in favor
of defendant and say by your verdict not guilty.The State responds by highlighting where in the charge this same information is conveyed
and argues that appellant failed to show how he was harmed by the trial courtâs denial of
his request. 
Â Â Â Â Â Â Â Â Â Â We note that the charge that was given to the jury instructed them that:
If you believe from the evidence beyond a reasonable doubt that in the
County of Williamson and State of Texas, on or about June 13, 2006, the
Defendant Christopher Lee Simpson, Jr. did operate a motor vehicle in a
public place while he was intoxicated, namely by not having the normal use
of mental or physical faculties by reason of the introduction of alcohol into
the body, you will find the Defendant âguiltyâ as charged, but if you do not so
find, or if you have a reasonable doubt thereof, you will acquit the Defendant
by a verdict of ânot guilty.â
Comparing this paragraph of the jury charge with the instruction requested by appellant
reveals that the requested instruction was superfluous. The charge instructed the jury as
to the elements of the offense, the presumption of innocence, the beyond a reasonable
doubt standard, and properly applied the law to the facts in the application paragraph. As
such, we cannot conclude that the trial court erred in denying appellantâs requested
instruction and we overrule appellantâs third issue.
Conclusion
Â Â Â Â Â Â Â Â Â Â Having overruled each of appellantâs issues, we affirm the judgment of the trial
court.
Mackey K. Hancock

Justice

Do not publish.




itleCxSpMiddle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpLast, li.MsoTitleCxSpLast, div.MsoTitleCxSpLast
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoSubtitle, li.MsoSubtitle, div.MsoSubtitle
 {mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Subtitle Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 font-family:"Calibri","sans-serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
span.SpellE
 {mso-style-name:"";
 mso-spl-e:yes;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 font-size:10.0pt;
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-09-0058.cr%20opinion%202_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-09-0058.cr%20opinion%202_files/header.htm") fcs;
 mso-endnote-separator:url("07-09-0058.cr%20opinion%202_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-09-0058.cr%20opinion%202_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-09-0058.cr%20opinion%202_files/header.htm") f1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
-->








NO. 07-09-00058-CR

Â 

IN THE COURT OF APPEALS

Â 

FOR THE
SEVENTH DISTRICT OF TEXAS

Â 

AT
AMARILLO

Â 

PANEL B

Â 



JUNE
29, 2010

Â 



Â 

BUD PURDY, APPELLANT

Â 

v.

Â 

THE STATE OF TEXAS, APPELLEE 



Â 



Â 

 FROM THE 84TH DISTRICT COURT OF HUTCHINSON
COUNTY;

Â 

NO. 10,199; HONORABLE WILLIAM D. SMITH, JUDGE



Â 



Â 

Before QUINN,
C.J., and CAMPBELL and HANCOCK, JJ.

Â 

Â 

MEMORANDUM OPINION

Â 

Appellant, Bud Purdy, was convicted
of aggravated assault with a deadly weapon[1]
and sentenced to serve 18 years in the Institutional Division of the Texas
Department of Criminal Justice (ID-TDCJ).Â 
Appellant appeals contending that the evidence is factually insufficient
to support the judgment.Â  We reverse.

Â 

Â 

Factual
Background

On April 24, 2008, Skyler Hogan was walking to the home of his friend, Stetson
Reeves, in Fritch, Texas.Â  As Skyler walked down Bonner Street in Fritch, he was
approached by appellant, who asked, ÂAre you the owner of a red truck?ÂÂ  Skyler advised
appellant that he did not own a red truck but that his uncle did.Â  Appellant then stated that SkylerÂs uncle owed him Â$500 and jail time.Â[2]Â  As Skyler and
appellant continued to face each other, appellant became more and more
agitated.Â  Eventually, appellant pulled a
knife out of his pants pocket.Â  Skyler testified that he did not get a real good look at
the knife but he described it as being about 1 inch wide, tapered to a sharp
point, and had a blade that was estimated at three inches long.[3]Â  Skyler further
testified that during the time appellant was holding the open knife, appellant
kept saying ÂIÂll stab you, IÂm crazyÂ or ÂIÂm psycho, IÂll stab you.ÂÂ  In describing how he reacted to appellantÂs
statements, Skyler explained that it caused him
concern.Â  Later, during further
examination by the State, Skyler said that the open
knife caused him to feel threatened.Â  Skyler did admit that, at one point during the
confrontation with appellant, he told appellant to put the knife away and that
he did not know why appellant would want to stab him.Â  As SkylerÂs friend,
Stetson Reeves, walked up, appellant put the knife back in his pocket and
walked away.Â Â Â  

Approximately a week after the
confrontation, Deputy Eric Munoz, of the Hutchison County SheriffÂs Office went
to appellantÂs home and began visiting with him about the assault on Skyler.Â  Initially,
Munoz suspected appellantÂs roommate, Charles Beaver, was the assailant.Â  However, Munoz testified that as he spoke
with appellant about the incident, appellant began acting extremely
nervous.Â  After observing appellantÂs
demeanor, Munoz began focusing his questions on appellant having been the
assailant.Â  Appellant then admitted that
he was the one who approached Skyler, however, he denied ever pulling a knife.Â  After initially confronting appellant, Munoz
called Skyler on a cell phone and had him come to the
location where Munoz was interviewing appellant.Â  Upon seeing appellant, Skyler
advised Munoz that appellant was the man who had assaulted him.Â  

Munoz continued to interview
appellant and positioned his patrol car such that he was able to record a
significant portion of the interview.Â 
During the interview, appellant admitted that he did confront Skyler about someone owing him $500 and 15 days because of
the fine and jail sentence he had received in the earlier assault case.Â  Ultimately, Munoz presented a report of his
investigation to the Hutchinson County District Attorney, and appellant was
indicted for the instant offense.Â  A jury
convicted appellant and sentenced him to serve 18 years confinement in the
ID-TDCJ.Â  

Â Â Â Â Â Â Â Â Â Â Â  Appellant
has perfected his appeal and alleges that the evidence was factually
insufficient to sustain the judgment in two particulars.Â  First, appellant alleges that the evidence
was insufficient to show that the knife at issue was a deadly weapon.Â  Second, appellant alleges that the evidence
was insufficient to prove that Skyler was in fear of
imminent bodily injury or death.Â 
Agreeing with appellant on the issue of the deadly weapon, we reverse
the judgment of the trial court.

Standard of Review

Â Â Â Â Â Â Â Â Â Â Â  When
an appellant challenges the factual sufficiency of the evidence supporting his
conviction, the reviewing court must determine whether, considering all the
evidence in a neutral light, the jury was rationally justified in finding the
appellant guilty beyond a reasonable doubt.Â 
See Watson v. State, 204 S.W.3d 404,
415 (Tex.Crim.App. 2006).Â  In performing a factual sufficiency review,
we must give deference to the fact finderÂs determinations if supported by
evidence and may not order a new trial simply because we may disagree with the
verdict.Â  See id. at 417.Â  As an
appellate court, we are not justified in ordering a new trial unless there is
some objective basis in the record demonstrating that the great weight and
preponderance of the evidence contradicts the juryÂs verdict.Â  See id.Â  Additionally, an appellate opinion addressing
factual sufficiency must include a discussion of the most important evidence
that appellant claims undermines the juryÂs
verdict.Â  Sims v.
State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).Â  The Texas Court of Criminal Appeals has
recently declared that, when reviewing the evidence for factual sufficiency,
the reviewing court should measure the evidence in a neutral manner against a
Âhypothetically correct jury charge.ÂÂ  Vega
v. State, 267 S.W.3d 912, 915 (Tex.Crim.App.
2008) (citing Wooley v. State, 273
S.W.3d 260, 268 (Tex.Crim.App. 2008)).

Â 

Â 

Analysis

Â Â Â Â Â Â Â Â Â Â Â  In
order to convict appellant of the indicted offense, the State was required to
prove that: 1) appellant, 2) on or about April 24, 2008, 3) intentionally and
knowingly, 4) used a deadly weapon, to-wit, a knife, 5) that in the manner of
its use and intended use was capable of causing imminent bodily injury or
death, 6) and did threaten Skyler Hogan with imminent
bodily injury by the use of the deadly weapon.Â 
AppellantÂs two contentions regarding the factual sufficiency of the
evidence involve the evidence supporting the jury verdict that the knife in
question was a deadly weapon and whether Skyler was
in fear of imminent bodily injury.Â  We
will address only the deadly weapon issue.

Deadly Weapon

Â Â Â Â Â Â Â Â Â Â Â  A
knife is not defined as a Âper seÂ deadly weapon in the Penal Code.Â  See Tex.
Penal Code Ann. Â§ 1.07(a)(17)(A) (Vernon 2008);
Jaramillo v. State, No. 07-08-0148-CR, 2009 Tex.App.
LEXIS 1781, at *7 (Tex.App.ÂAmarillo
March 13, 2009, no pet.) (not designated for
publication) (citing Thomas v. State, 821
S.W.2d 616, 619 (Tex.Crim.App. 1991)).Â  Rather, the State must prove that, in the
manner of its use and intended use, the knife is capable of causing death or
serious bodily injury.Â  See Tex. Penal Code Ann. Â§ 1.07(a)(17)(B); Jaramillo, 2009 Tex.App.
LEXIS 1781, at *7.Â 
When addressing the issue of whether an instrumentality is a deadly
weapon, in this case a knife, under Section 1.07(a)(17)(B), the Texas Court of
Criminal Appeals has written that the Âplacement of the word ÂcapableÂ is
crucial to understanding this method of determining deadly-weapon status.ÂÂ  Tucker v. State, 274 S.W.3d 688, 691 (Tex.Crim.App. 2008).Â 
The State is not required to prove that the knifeÂs use or intended use
actually caused death or serious bodily injury but that the use or intended use
is capable of causing death or serious bodily injury.Â  Id.Â 


In Tucker, the operative facts
were that the victim had received two puncture wounds.Â  Id. at 688.Â  This fact pattern led the court to state
that, Âthe injuries suffered by the victim can by themselves
be a sufficient basis for inferring that a deadly weapon was used.ÂÂ  Id. at 691-92.Â  Because the Texas Court of Criminal Appeals felt
that the court of appeals failed to take into account all of the facts, most
especially the stab wounds of the victim, the decision of the court of appeals
was reversed and the evidence was found to be legally sufficient to support the
juryÂs verdict of guilty to the charge of aggravated assault with a deadly
weapon.Â  Id. at
92. 

Â Â Â Â Â Â Â Â Â Â Â  Subsequent
to the Tucker opinion, this court, in Jaramillo, considered the
factual sufficiency of the evidence to support a jury verdict of guilty of
aggravated assault where the operative question was whether or not the weapon
used, a knife, was a deadly weapon.Â  See
Jaramillo, 2009 Tex.App. LEXIS
1781, at *1.Â  As in the case
currently before the court, no knife was ever introduced into evidence.Â  The evidence regarding the nature of the
knife was that the victim testified that the defendant stuck a knife in the
back of her ear.Â  Id.Â  Further, upon arrival at the emergency room,
the victim presented with a stab wound to the upper chest.Â  Id. at *13.Â  The only testimony regarding the
characteristics of the knife in Jaramillo came from the defendantÂs
roommate, who testified the defendant carried a gray knife with a little hooked
point on the end.Â  Id.
at *7.Â  Relying on Tucker
we held that, even without more testimony regarding the characteristics of the
knife in question, the wounds suffered by the victim were enough to make the
evidence factually sufficient to support the juryÂs verdict.Â  Id. at *15-*16.

Â Â Â Â Â Â Â Â Â Â Â  In
the case at bar, we find no injuries to the victim.Â  Tucker, 274 S.W.3d
at 691-92.Â  We have no expert
testimony regarding the characteristics of the knife in question. See Rogers
v. State, 877 S.W.2d 498, 500 (Tex.App.ÂFort
Worth 1994, pet. refÂd) (actual knife not introduced
but similar knife introduced with expert police testimony that such a knife was
capable of causing serious bodily injury). We have very little testimony
regarding the physical description of the knife in question.Â  See Brown v. State, 716 S.W.2d 939, 946 (Tex.Crim.App.
1986).Â  Further, the proximity of
appellant to Skyler was such as to make a finding of
a deadly weapon less likely.Â  See Tisdale
v. State, 686 S.W.2d 110, 115 (Tex.Crim.App.
1983).Â  

Â Â Â Â Â Â Â Â Â Â Â  In
the case before us, the victim, Skyler, suffered no
wounds.Â  In fact, SkylerÂs
testimony was that the knife never touched him.Â 
From the record, it appears that appellant kept the knife in question
down by his side the entire time he confronted Skyler.Â  Skyler testified
that he could not see the knife clearly and could not describe exactly what it
looked like.Â  Further, the only evidence
regarding the characteristics of the knife was a small amount of comparison
testimony when Skyler was shown a ballpoint pen and
estimated that the blade of the knife was about as long as the bottom part of
the pen.Â  Subsequently, the StateÂs
attorney measured this length to be about three inches.Â  When asked if he could tell how sharp the
knife was, Skyler said he could not.Â  The record is not clear regarding the
proximity of appellant to Skyler.Â Â Â Â  

Â 
Based upon the record we have been presented with, the juryÂs decision
to find appellant guilty beyond a reasonable doubt is against the great weight
and preponderance of the evidence.Â  Watson,
204 S.W.3d at 417.Â 
We therefore find the evidence to support the judgment that appellant
used and intended to use a deadly weapon, to-wit, a knife, that in the manner
of its use and intended use was capable of causing death and serious bodily
injury to be factually insufficient.Â 
AppellantÂs first issue is sustained.

Conclusion

Â Â Â Â Â Â Â Â Â Â Â  Having
found the evidence factually insufficient, we reverse and remand this matter to
the trial court for further proceedings consistent with this opinion.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  

Â 

Â 

Mackey K. Hancock

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Do
not publish.Â  











[1] See Tex.
Penal Code Ann. Â§ 22.02(a)(2) (Vernon Supp.
2009).

Â 





[2] This was a reference to appellantÂs prior conviction
for assault that resulted in a fine of $500 and 15 days in jail.Â  Appellant believed that SkylerÂs
uncle, Tom Pena, had been the person who reported the assault to the police.

Â 





[3] During direct examination, Skyler
estimated the length of the blade by demonstrating its length on a ball point
pen.Â  The prosecutor then measured that
length with a ruler.